UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

TOSHNELLE FOSTER,

                    Defendant.

**MEMORANDUM OPINION
& ORDER**

11 Cr. 451 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          Defendant Toshnelle Foster, a prior felon, is charged with possessing a firearm in violation of 18 U.S.C. § 922(g)(1).  Foster has moved to suppress (1) a firearm recovered at the time of his arrest, claiming that his arrest was not supported by probable cause; and (2) his post-arrest statements, claiming that they are the fruit of an unlawful arrest and were elicited in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), <u>Missouri v. Siebert</u>, 542 U.S. 600 (2004), and their progeny.  For the reasons stated below, the motion to suppress will be denied in its entirety.

## BACKGROUND

### I.      FOSTER'S AFFIRMATION

          In support of his motion to suppress, Foster submitted an affirmation setting forth the following version of events:  On January 25, 2011, New York City Police ("NYPD") officers arrested him and Javon Jones, a close friend whom Foster considers his "cousin."  (Foster Aff. ¶ 3)  Foster did not display a gun, nor was any firearm visible on his person, prior to or at the time of his arrest.  (<u>Id.</u> ¶ 4)  While driving to the 44th Precinct, and while in a holding cell at the

precinct, Officer Alberto Puente – the arresting officer – repeatedly asked Foster "whether [he] was going to let Mr. Jones 'go down' for something he didn't do."  (Id. ¶ 5)

Once at the precinct, Foster – then 18 years old – told Officer Puente that he wanted to call his mother.  (Id. ¶ 6; Tr. 110)  Officer Puente brought Foster his cell phone, but before giving it to him asked him if he had "come to a conclusion" about the gun.  (Id.)  In response, Foster told the officer that the gun was his.  (Id. ¶ 7)  Officer Puente then told Foster to make a written statement and to include a description of the gun, which Foster did.  (Id.)  Foster denies being given Miranda warnings or signing a Miranda waiver form prior to making his oral and written statements.  (Id. ¶ 8)

After making the written statement, Foster was repeatedly questioned about the gun by other law enforcement officers.  (Id. ¶ 9)  Between 9:00 p.m. and 10:00 p.m., Foster signed a Miranda waiver form and made a second written statement.  (Id. ¶ 10)

The following day, Foster was questioned several times by different law enforcement officers.  (Id. ¶¶ 12-14)  Foster was never told that his oral and written statements to Officer Puente would not be admissible in court and Foster believed the statements could be used against him.  (Id. ¶ 15)

## II.    SUPPRESSION HEARING TESTIMONY

The Court conducted an evidentiary hearing on Foster's suppression motion on November 8 and 14, 2011, and heard argument on December 19, 2011.  Foster did not testify at the hearing.  The Government called two police officers involved in Foster's arrest – Officer Puente and Sergeant Danny Diaz – and Foster called the third officer involved in the arrest – Officer Angel Andujar.   The Court also heard testimony from several officers and agents who questioned Foster post-arrest.

### A.    January 24, 2011 Gang-Related Attack and Homicide

At the suppression hearing, the Government offered evidence that Foster is a member of a violent gang called "God's Favorite Children" or "GFC." (Tr. 262, 270, 293-94) Foster has the initials "GFC" tattooed on his right arm. (Tr. 293-94) The Bureau of Alcohol, Tobacco and Firearms ("ATF") has been investigating gang activities and related shootings involving GFC. (Tr. 262, 276-78) Members of GFC – including Foster's "cousin" Javon Jones – have been charged in Indictment S2 11 Cr. 576(WHP) with violations of the RICO statute, with narcotics trafficking, and with a variety of violent acts, including murder.[1] (Gov't Reply Br. 7 n.2)

During the evening of January 24, 2011 – the night before Foster's arrest in this case – Foster and other members of GFC were "hanging out" on Courtlandt Avenue in the Bronx when they were chased by members of a rival gang known as YG or "Young Guns" attempting to rob them. (Tr. 189-91, 203-05, 208-09, 270, 278) Foster and his associates barricaded themselves in the back room of a nearby deli. (Tr. 189-91, 203-05, 208-09, 270) After Foster and his GFC colleagues sought refuge in the deli, a friend of Foster's was murdered outside. (Tr. 189-91, 205-07, 234)

### B.    Foster's January 25, 2011 Arrest

At approximately 1:40 p.m. on January 25, 2011, three members of the 44th Precinct's Anti-Crime Unit – Officers Puente and Andujar, and Sergeant Diaz – were driving north on Concourse Village West in the Bronx in an unmarked police vehicle. (Tr. 7, 58, 306) Officer Andujar was driving slowly, approximately five miles per hour or less. (Tr. 8, 311)

---

[1] The gang is referred to as the "Courtlandt Avenue Crew" in the indictment.

Officer Puente and Sergeant Diaz saw Foster and Jones standing on the sidewalk engaged in conversation.  (Tr. 8-9, 58-59; Gov't Ex. 103)  Sergeant Diaz – who was seated in the rear passenger-side of the car about five feet away from Foster – saw him show the brown butt of a gun to Jones.  (Tr. 8-10, 31-32)  Foster was holding the gun near his waistband.  (Id.)  Officer Puente – seated in the front passenger seat – likewise saw the brown handle of a large gun tucked into Foster's waistband.  (Tr. 58-60, 63, 113-114)

Officer Puente told Officer Andujar to stop the car and all three officers then exited the vehicle yelling "police, don't move" and/or "police, stop."  (Tr. 15, 63, 101, 307)  After the officers identified themselves, Foster began to run, and Officers Puente and Andujar gave chase.  (Tr. 15-16, 63, 102, 307)  Foster ran up a ramp leading into the courtyard of an apartment building complex.  (Tr. 16, 41-42, 63-64, 307-09; Gov't Ex. 105)  Officer Puente lost sight of Foster for about two to five seconds as Foster turned up the ramp.  (Tr. 64; Gov't Ex. 107)  While chasing Foster, Officer Puente had his weapon drawn and was saying "police, stop." (Tr. 68, 107)

In the courtyard, Foster threw himself on the ground and placed his hands behind his back.  (Tr. 68, 70, 104-105; Gov't Ex. 113)  Officer Puente did a visual inspection of Foster[2] and the surrounding area, but did not recover a gun.  (Tr. 70-71)

Officer Puente then escorted Foster back to the sidewalk along the same path Foster had run, looking for a gun.  (Tr. 71-72, 107-09, 116, 309-10)  Officer Andujar also looked on the ground during the walk back to the sidewalk, but testified that he did not know that he should be looking for a gun.  (Tr. 310)

---

[2]  Officer Andujar testified that Officer Puente patted down Foster.  (Tr. 309)  Officer Puente recalled doing a visual inspection of Foster and stated that it was possible he had patted him down.  (Tr. 106)

While Officers Puente and Andujar chased Foster, Sergeant Diaz remained on the sidewalk with Jones, who did not attempt to flee. (Tr. 16) Sergeant Diaz asked Jones for his name, date of birth, and address. (Tr. 17)

When Officers Puente and Andujar returned to the sidewalk with Foster, Sergeant Diaz instructed Officer Puente to remain with Foster and Jones while he and Officer Andujar canvassed the area for a gun. (Tr. 17-18) While searching, Sergeant Diaz observed a brown object in a pile of snow at the top of the ramp, next to a garbage can. (Tr. 18-19) Sergeant Diaz retrieved the object, which he discovered was a revolver loaded with six rounds of ammunition. (Tr. 19-21; Gov't Ex. 7; Gov't Ex. 8)

Sergeant Diaz then instructed Officers Puente and Andujar to place Foster and Jones under arrest, and they were then handcuffed. (Tr. 19, 22, 75-76) The arrest occurred at approximately 1:45 or 1:50 p.m. (Tr. 17, 52, 123) Sergeant Diaz showed the revolver he had recovered to Officer Puente, who recognized the brown handle of the gun. (Tr. 75) Sergeant Diaz called other members of the Anti-Crime Unit to assist in transporting Foster and Jones to the precinct. (Tr. 22)

Officer Puente testified that he did not ask Foster any questions about the gun either while he was obtaining Foster's pedigree information at the scene or during transport to the 44th Precinct. (Tr. 75, 77, 121) Sergeant Diaz testified that he did not recall any exchanges between a police officer and Foster or Jones during transport back to the precinct. (Tr. 23) Officer Andujar likewise did not recall hearing about any statements made by Foster or Jones while being transported to the precinct. (Tr. 315)

After arriving at the 44th Precinct, Officer Puente obtained pedigree information from both defendants, fingerprinted them, and searched their clothing for weapons or

contraband.  (Tr. 24, 77-78)  Officer Puente placed Foster and Jones in separate holding cells.

(Tr. 78)  As is required in connection with a gun arrest, Officer Puente also notified Borough

Patrol, the Gun Enhancement Unit, and the Evidence Collection Unit of the arrest.  (Tr. 90)

During arrest processing, Foster repeatedly asked Officer Puente if he could use

his cell phone.  (Tr. 78)  After Officer Puente completed arrest processing, he permitted Foster to

use his cell phone.  (Tr. 79)

Officer Puente denied asking Foster any questions about the gun during arrest

processing.  (Tr. 79)  Officer Puente did check on Foster every thirty minutes while he was in the

precinct's holding cell.  (Tr. 79-80, 124)  On one such occasion, Foster told Puente that he did

not want his "cousin" to get in trouble and that he wanted to talk.  (Tr. 80)  Foster's statement

suggested to Puente that he intended to take responsibility for the gun.  (Tr. 128)  Officer Puente

testified that Foster initiated the exchange and that he did not ask Foster any questions prior to

the statement.  (Tr. 80-81)  After Foster made this statement, Officer Puente told Foster that he

would be debriefed later and that he would receive <u>Miranda</u> warnings before he was asked any

questions.  (Tr. 81)

Officer Puente testified that he does not typically question detainees (Tr. 80-81),

and Sergeant Diaz noted that patrol officers are instructed not to question arrestees, as this task is

performed by members of the precinct's detective squad.  (Tr. 25)  Sergeant Diaz explained that

detectives have interrogation skills, are in charge of investigations, and have the forms that must

be completed before detainees are questioned.  (Tr. 25)

At some point after Foster made the remark about protecting his "cousin," Officer

Puente brought Foster to the detective squad's offices on the precinct's second floor.  (Tr. 82-83)

Officer Puente gave Sergeant Freytes of that unit Foster's pedigree information and told him

what charges would be brought against him.  (Tr. 82, 132-33)  Officer Puente did not tell Sergeant Freytes what Foster had said about wanting to protect his "cousin."  (Tr. 167)

Sergeant Freytes's interrogation of Foster began at 5:00 p.m.  Officer Puente was present for the interview but did not speak during it.  (Tr. 89, 134, 168-69, 172; Gov't Ex. 1)  Sergeant Freytes began by administering <u>Miranda</u> warnings, using a <u>Miranda</u> waiver form.  (Tr. 83-84, 168-70, 182; Gov't Ex. 1)  Sergeant Freytes read Foster each question on the waiver form and asked Foster if he understood it.  Freytes wrote a "y" next to each question to indicate Foster's affirmative responses and then asked Foster to write his initials next to each question, which Foster did.  (Tr. 170; Gov't Ex. 1)  After Freytes had reviewed each question with Foster, Foster stated that he was willing to answer questions.  (Tr. 171)  Sergeant Freytes then signed the form, printed Officer Puente's name on the witness line, and had Foster sign the form.  (Tr. 170)  Foster appeared calm and relaxed throughout the interview.  (Tr. 85, 171)

Foster first made an oral statement.  (Tr. 171)  He told Freytes that he had been walking with his "cousin" when he observed the police stop.  Foster said that he threw the gun and "took off running."  (Tr. 171)  He also stated that he was carrying the gun for protection and that his "cousin" did not know that he was carrying a gun.  (Tr. 87, 171-72, 234)  Foster did not tell Sergeant Freytes about his earlier statement to Officer Puente nor did Sergeant Freytes reference any prior statement.  (Tr. 88-89; 172)

After Foster's oral statement, Sergeant Freytes asked Foster to make a written statement.  (Tr. 173)  Foster's written statement reads as follows:

> On this day I Tosh'Nelle was walking with my cousin and officers pulled up and I ran and toss[ed] the gun because I was scared.  I had it on me for protection.  The gun I tossed had a brown handle and black barr[el].  I confes[s]ed to the situation so that my cousin wouldn't get into trouble for

this.  I was not forced to write this statement at all by any officers.[3]
(Gov't Ex. 2)

The interview ended at approximately 5:24 p.m.  (Tr. 94; Gov't Ex. 2)

Foster was subsequently interviewed by Detective Jesus Rodriguez of the 40th

Precinct, Detective Steven Mayfield from the NYPD's Gun Enhancement Unit, ATF Agent

Janice Castillo, and Assistant District Attorney Ann Lee of the Bronx County District Attorney's

Office.  In his interview with Detective Mayfield, Foster stated that he ran from the police

because he had a gun, which he threw into the snow by some garbage before the police

apprehended him.  (Tr. 234)  Foster told both Detective Mayfield and Agent Castillo that he had

obtained the gun in October or November 2010.  While attending a party in Harlem, he saw "two

young kids" playing with a gun and took the firearm away from them.  Foster said that he kept

the gun at his aunt's house until the gang attack and homicide on January 24, 2011.  Foster began

carrying the gun the next day for protection.  (Tr. 234, 269-70)

### DISCUSSION

## I.    FOSTER'S ARREST WAS SUPPORTED BY PROBABLE CAUSE

### A.    Legal Standard

The Fourth Amendment requires that an arrest be supported by probable cause.

See, e.g., United States v. Valentine, 539 F.3d 88, 93 (2d Cir. 2008).  "[P]robable cause is 'a

fluid concept – turning on the assessment of probabilities in particular factual contexts – not

---

[3]  Foster's written statement initially did not contain the last sentence.  After reviewing Foster's
statement, Sergeant Freytes asked Foster whether anyone had forced him to make the written
statement.  Foster answered "no," and Freytes then suggested that Foster so indicate in his
statement.  (Tr. 173-74)  Foster agreed, but then wrote, "I was forced to write this statement at all
by any officers."  (Tr. 184)  Sergeant Freytes then asked Foster if he intended to write that he had
been forced to make the statement.  Foster said that he had not and corrected the statement by
crossing-out "was" and inserting "was not."  (Tr. 184-85; Harris Aff., Ex. A)

readily, or even usefully, reduced to a neat set of legal rules.'" United States v. Clark, 638 F.3d 89, 94 (2d Cir. 2011) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). "'Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.'" Valentine, 539 F.3d at 93 (quoting United States v. Patrick, 899 F.2d 169, 171 (2d Cir. 1990) (citing Brinegar v. United States, 338 U.S. 160, 175-76 (1949))). "'[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Because the standard is fluid and contextual, a court must examine the totality of the circumstances of a given arrest.'" United States v. Steppello, No. 10-4527-cr, 2011 WL 6450795, at *4 (2d Cir. Dec. 23, 2011) (quoting United States v. Delossantos, 536 F.3d 155, 159 (2d Cir. 2008) (citations and internal quotation marks omitted)). "When making a probable cause determination, '[t]he experience of a [law enforcement] officer is a factor to be considered.'" Arias v. United States, Nos. 09 Civ. 4536(CM), 07 Cr. 813(CM), 2011 WL 1332190, at *8 (S.D.N.Y. Mar. 31, 2011) (quoting United States v. Fisher, 702 F.2d 372, 378 (2d Cir. 1983)).

Probable cause "requires neither a prima facie showing of criminal activity nor a showing that evidence of crime will more likely than not be found. Rather, it requires only the possibility of criminal activity or the possibility that evidence of a crime will be found." United States v. Rodriguez, No. S107 Cr. 699(HB), 2008 WL 52917, at *5 (S.D.N.Y. Jan. 2, 2008) (internal quotation marks and citations omitted). "The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction,

but it must constitute more than rumor, suspicion, or even a 'strong reason to suspect.'" <u>Fisher</u>, 702 F.2d at 375 (quoting <u>Henry v. United States</u>, 361 U.S. 98, 101 (1959)) (citations omitted).

**B.    <u>Analysis</u>**

Here, the probable cause determination turns on whether the police officers saw the butt of a gun tucked into Foster's waistband prior to his arrest.

Foster argues that the police officers' testimony on this point is implausible, because it is "unlikely that anyone would display a large gun in broad daylight in the middle of the sidewalk in a residential neighborhood."  (Def. Post-Hearing Br. 15, 17)  However, the evidence adduced at the hearing was not that Foster displayed "a large gun in broad daylight," but rather that he showed to a very close friend the butt of a gun tucked into his waistband. Given the attack by the rival gang the prior evening and the shooting death of Foster's friend, it is entirely plausible both that Foster would be carrying a gun to protect himself and that he would show the gun to his close friend.  It is even more plausible that Foster would show the gun to Jones, in light of his gang membership, as alleged in Indictment S2 11 Cr. 576(WHP).

As to whether the police officers saw a gun in Foster's waistband, the defense has offered no other plausible explanation for why the officers stopped their vehicle and approached Foster.  There is no evidence that Officer Puente and his colleagues were targeting Foster or Jones that day or that they had any prior experience with or knowledge of them.  Defense counsel's argument that the police officers were engaged in random harassment (Def. Reply Br. 2 n.2) which fortuitously led to recovery of a handgun is entirely unsupported.

The Court must also consider the undisputed evidence that Foster ran after the police officers identified themselves as police.  (Tr. 15, 63)  While defense counsel argues that Foster recognized the unmarked car and ran because he feared further detention – having been

held for several hours the night before as a witness to a homicide (Def. Reply Br. 2) – there is again no evidence in the record to support that theory. Foster's affirmation does not explain why he ran. The explanation best supported by the evidence is that Foster ran because he was in possession of a gun, and he feared that the police were telling him to stop because they had seen the butt of that weapon.

The fact that the officers did not observe Foster dispose of the gun does not undermine a finding of probable cause, because the officers had probable cause to arrest Foster based on observing the gun in his waistband.[4] The testimony established that Foster ran up a ramp into the apartment complex and that Officer Puente's view of him was momentarily obscured. (Tr. 64) Given that Officer Puente lost sight of Foster for a few seconds while he was running up the ramp near the garbage can, there was an opportunity for Foster to discard the gun out of Officer Puente's sight. The subsequent recovery of the gun near the garbage can – which was along the route of Foster's flight – merely supports a finding that Foster did in fact have a handgun in his waistband when the police approached.

Finally, while this Court has considered both Foster's affirmation and the law enforcement officers' testimony at the suppression hearing, the latter is entitled to more weight because it was subject to cross-examination. See, e.g., United States v. Fuentes, No. 07 Cr. 329(SHS), 2007 WL 2319142, at *4 (S.D.N.Y. Aug. 10, 2007) (crediting witness testimony over defendant's sworn statement regarding whether he gave consent); United States v. Robles, 253 F.

---

[4]  Defense counsel makes much of the fact that in a state court complaint Officer Puente states that he "observed defendant to have on his person, in his waistband which he threw to the ground, one (1) .45 caliber Smith & Wesson revolver loaded with six (6) .45 caliber live rounds." (Def. Ex. Q) (emphasis added)  In the Court's judgment, this statement is entirely consistent with Officer Puente's testimony at the suppression hearing. Given the sequence of events, Officer Puente was entitled to infer that Foster disposed of the gun at the top of the ramp while he was outside of the officer's view.

Supp. 2d 544, 549 n.14 (S.D.N.Y. 2002) (noting that courts "'give greater weight to [witness] testimony, which was subject to cross examination, than to affidavits'") (quoting United States v. Gardner, 611 F.2d 770, 774 n.2 (9th Cir. 1980)); United States v. Juliano, No. 99 Cr. 1197(AGS), 2000 WL 1206745, at *3 n.1 (S.D.N.Y. Aug. 24, 2000) (affording less weight to defendant's affidavit, because the court could not assess the defendant's credibility and the testimony of Government witnesses was "forthright and truthful") (citing United States v. Frank, 8 F. Supp. 2d 284, 291 (S.D.N.Y. 1998)).

Under the totality of the circumstances, it is entirely plausible that Foster possessed a gun on January 25, 2011; that he was showing the gun to his very close friend when the unmarked police vehicle approached; that Officer Puente and Sergeant Diaz saw the butt of that weapon; that because they had seen a weapon they told Officer Andujar to stop the car and announced themselves to Foster; and that Foster ran because he possessed a gun and feared that the police had seen it. Because the police had probable cause to arrest Foster, his motion to suppress the gun and his post-arrest statements as fruits of an unlawful arrest will be denied.

## II.    FOSTER'S POST-ARREST STATEMENTS WILL NOT BE SUPPRESSED

Foster has moved to suppress all of his post-arrest statements. The parties agree that Foster made an oral statement while in the 44th Precinct holding cell prior to receiving Miranda warnings. (Gov't Post-Hearing Br. 8; Def. Post-Hearing Br. 7; Foster Aff. ¶ 7) The Government alleges that the statement was made spontaneously (Gov't Post-Hearing Br. 8), while Foster claims that he made the statement in response to Officer Puente's questioning and that the statement must be suppressed as violative of Miranda. (Def. Post-Hearing Br. 24-25; Foster Aff. ¶¶ 5-6) Foster further argues that all of his subsequent statements must be suppressed because they were obtained through Officer Puente's use of a deliberate, two-step strategy in

violation of <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004). (Def. Post-Hearing Br. 21) Because the Court concludes that Foster's oral statement in the holding cell was spontaneous, it is not necessary to reach Foster's <u>Seibert</u> arguments.

### A.    <u>Legal Standard</u>

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning. . . . [the following] [p]rocedural safeguards must be employed to protect the privilege [against self-incrimination]":

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

<u>Miranda</u>, 384 U.S. at 478-79.

"The purpose of the <u>Miranda</u> warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." <u>United States v. Carter</u>, 489 F.3d 528, 534 (2d Cir. 2007) (citing <u>Miranda</u>, 384 U.S. at 444-45). Only unwarned statements made after interrogation are prohibited, however. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind of are not barred by the Fifth Amendment . . . ." <u>Miranda</u>, 384 U.S. at

478. For purposes of <u>Miranda</u>, "interrogation" "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 292 (1980).

Where a defendant "has alleged police custodial interrogation in the absence of <u>Miranda</u> warnings, the burden shifts to the government to prove <u>Miranda</u> voluntariness, either because there was no custodial interrogation implicating <u>Miranda</u>, there was some exception to the <u>Miranda</u> rule, or because [the defendant] was properly <u>Mirandized</u> and waived his rights." <u>United States v. Miller</u>, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005) (citing <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972); <u>United States v. Anderson</u>, 929 F.2d 96, 98 (2d Cir. 1991)).

### B.  Analysis

Foster argues that the oral statement he made to Officer Puente while in the holding cell of the 44th Precinct – to the effect that he did not want his cousin to get in trouble and that he wanted to talk[5] – was made in response to Officer Puente's questioning and must be suppressed under <u>Miranda</u>.[6]  The Court concludes that the Government has met its burden of establishing that the statement was made spontaneously and not in response to interrogation and that, accordingly, Foster's motion to suppress the unwarned statement will be denied.  Because Foster's motion to suppress his subsequent statements is based solely on the argument that they

---

[5]  In his affirmation, Foster states that he told Officer Puente, "among other things, that the gun was mine."  (Foster Aff. ¶ 7)  Officer Puente testified that Foster stated that he "wanted to talk" about "his cousin not getting into trouble," and that this remark suggested to Officer Puente that Foster intended to take responsibility for the gun.  (Tr. 128)

[6]  Foster's claim that he provided a written statement to Office Puente (<u>see</u> Foster Aff. ¶ 7) has no evidentiary support.  The evidence demonstrates that Foster's initial written statement was provided to Sergeant Freytes, and that this statement was given after Foster – contrary to his claim (<u>id</u>. ¶ 8) – executed a <u>Miranda</u> waiver form.

are the fruit of the earlier, unwarned statement in the holding cell, his motion to suppress will be denied as to these statements as well.

Foster claims that he was first questioned while being transported to the precinct; Foster maintains that Officer Puente repeatedly asked him whether he was going to let Jones "go down" for something he did not do. (Foster Aff. ¶ 5) Officer Puente testified, however, that none of the officers questioned Foster during the car ride to the precinct (Tr. 77, 121), and Sergeant Diaz and Officer Andujar denied speaking with Foster during the car ride. (Tr. 23, 314-15)

Foster claims that while he was in the holding cell, Officer Puente again repeatedly asked him whether he was going to let Jones "go down" for the gun. (Foster Aff. ¶ 5) When Officer Puente gave Foster his cell phone – so that he could call his mother – Foster alleges that Officer Puente asked Foster if he had "come to a conclusion" about the gun. (Id. ¶ 6) Foster claims that in response to Officer Puente's questioning, he admitted that the gun was his. (Id. ¶ 7)

Officer Puente testified that he did not question Foster while he was in the holding cell and that interrogation of arrestees is a task performed by the detective squad. (Tr. 80) Sergeant Diaz likewise testified that arresting officers such as Officer Puente do not conduct interviews or debriefings of detainees, because these activities are the responsibility of detectives. (Tr. 25) Officer Puente testified that as soon as Foster made a statement to him, he advised Foster that he would be debriefed by the detective squad, which would administer Miranda warnings. (Tr. 81)

Numerous law enforcement officers questioned Foster after his arrest. Sergeant Freytes, Detective Mayfield, and Detective Rodriguez all testified that Officer Puente did not

advise them of any prior statements made by Foster.  (Tr. 167, 181, 195-96, 219, 224)[7]  Had

Officer Puente taken it upon himself to interrogate Foster during the car ride to the precinct or in

the holding cell – in violation of procedure – it seems likely that he would have reported his

success in extracting information from Foster to subsequent interviewers.  But there is no such

evidence.

Here, the Court finds credible Officer Puente's account that he followed protocol

and did not question Foster.  Officer Puente appears to have understood that his role as the

arresting officer was limited to processing Foster and Jones and that it was solely the

responsibility of the detective squad to interrogate Foster.  (Tr. 80-81)

The Court rejects defense counsel's argument that Foster's statement in the

holding cell was necessarily responsive to Officer Puente's alleged demand that he take

responsibility for the gun so that his "cousin" would not be prosecuted.  Foster knew that Jones

had been arrested and taken to the precinct.  No suggestion from Officer Puente was necessary

for Foster to decide to take responsibility for the gun.

Because Foster's unwarned statement in the holding cell was spontaneous and

voluntary, it is not necessary to reach Foster's argument that the subsequent interrogations

violate Elstad, Seibert, and their progeny.  Accordingly, Foster's motion to suppress his post-

arrest statements will be denied.

---

[7]  Detective Mayfield received a copy of the written statement Foster provided to Sergeant
Freytes, however.  (Tr. 224)

## CONCLUSION

Defendant Foster's motion to suppress the gun recovered at the scene of his arrest

and his post-arrest statements is denied in its entirety. The Clerk of Court is directed to terminate

the motion (Dkt. No. 16).

Dated: New York, New York
      January 9, 2012

SO ORDERED.

Paul G. Gardephe
United States District Judge